# UNITED STATES BANKRUPTCY COURT

### EASTERN DISTRICT OF VIRGINIA
### NORFOLK DIVISION

|  |  |  |
|---|---|---|
| In re: | ) | |
| | ) | |
| | ) | Case No. 14-71894-FJS |
| REMINGTON PARK OWNERS | ) | |
| ASSOCIATION, INC., | ) | |
| | ) | Chapter 7 |
| *Debtor.* | ) | |
| | ) | |

## MEMORANDUM OPINION

This matter comes before the Court on the Motion for Relief from Order Granting Assumption and Assignment of Contract to Infrastructure Management VA, LLC (the "Motion to Reconsider") filed on behalf of Charter Communications VI, LLC ("Charter") on February 27, 2015.  The Motion to Reconsider requests relief from the Court's order authorizing the chapter 7 trustee to assume and assign an executory contract pursuant to 11 U.S.C. § 365(a), entered on August 28, 2014.  Remington Infrastructure Management, L.L.C. ("RIM") and Infrastructure Management VA, LLC ("IVMA") filed a joint objection to the Motion to Reconsider on March 13, 2015 (the "Objection").  On April 14, 2015, the Court convened a hearing on the Motion to Reconsider and the Objection, at which counsel for Charter, counsel for RIM and IVMA, counsel for Remington Park Owners Association, Inc., and the chapter 7 trustee appeared.  At the hearing, the Court considered the arguments and evidence presented by the litigants.  In lieu of closing arguments, the Court ordered the submission of briefs, summarizing the arguments and evidence presented at the hearing.  *See* Transcript of April 14, 2015 Hearing at 112, ECF No. 40 (hereinafter "Tr."); *see generally* Post-Trial Order Setting Briefing Schedule and Making Initial

Findings of Fact, ECF No. 44.  Charter, RIM and IVMA, and Remington Park Owners Association, Inc., filed post-hearing briefs with the Court.[1]

The Court has jurisdiction over this proceeding pursuant to 28 U.S.C. §§ 157(b) and 1334(b).  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409(a).  This Memorandum Opinion constitutes the findings of fact and conclusions of law of this Court pursuant to Federal Rule of Civil Procedure 52, as incorporated into the Federal Rules of Bankruptcy Procedure by Rule 7052.

## I.    Procedural History

Remington Park Owners Association, Inc. (the "Debtor") filed a voluntary petition under chapter 7 of the United States Bankruptcy Code on May 22, 2014.  Clara P. Swanson was appointed chapter 7 trustee (the "Chapter 7 Trustee").

On Schedule C - Executory Contracts and Unexpired Leases, filed contemporaneously with the voluntary petition, the Debtor described an executory contract between the Debtor and RIM entitled, "Agreement to Obtain Communications Services," and dated January 10, 2007[2]

---

[1] While the Court has reviewed the post-hearing brief filed on May 29, 2015, on behalf of Remington Park Owners Association, the Court will not specifically consider the arguments raised therein because a chapter 7 debtor generally lacks standing to be heard with respect to matters concerning the disposition of property of the estate.  *See In re Nangle*, 288 B.R. 213, 216 (B.A.P. 8th Cir.) *aff'd,* 83 F. App'x 141 (8th Cir. 2003) (acknowledging that, unless a chapter 7 debtor can show a reasonable possibility of a surplus after distribution on allowed claims, the debtor has no pecuniary interest in the disposition of estate assets and thus lacks standing as a person aggrieved by a bankruptcy court order).

[2] The Debtor listed this contract as "rejected" on Schedule C.  However, the Court observes that this notation had no effect because the decision to assume or reject an executory contract in a chapter 7 case is within the province of the chapter 7 trustee.  *See* 11 U.S.C. § 365(a) ("[T]he *trustee*, subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor.") (emphasis added); *see also In re Raczkowski*, No. 01-80140, 2002 WL 230770, at *1 (Bankr. M.D.N.C. Feb. 13, 2002) ("According to the plain language of [11 U.S.C. § 365(a)], in a Chapter 7 case, the Chapter 7 trustee is the only party with authority to assume or reject an unexpired lease of the Debtor."); *In re Rodall*, 165 B.R. 506, 507

*See generally* Charter's Ex. 2, Agreement to Obtain Communication Services (hereinafter the "Communications Agreement").

The Communications Agreement arranged for the provision of Communication Services[3] to the residents of the Remington Park development in Suffolk, Virginia (the "Homeowners"). *See* Communications Agreement at 1, § 2.1.  At all relevant times prior to the filing of the chapter 7 petition in this case, the Debtor engaged RIM as its exclusive agent to coordinate, manage, and monitor the provision of Communication Services to the Homeowners via a third-party service provider, and to coordinate the design, installation, and operation of the telecommunications infrastructure necessary to provide such services.  *See id* § 2.1.  RIM provided this service in exchange for compensation to be included with the price of Basic Services (together, the "Service Fees for Basic Services") paid by the Debtor, less a per residential dwelling unit processing fee remitted by RIM to the Debtor.  *Id.* §§ 2.1, 2.5.  The Debtor collected the Service Fees for Basic Services from the Homeowners with the Homeowners' monthly assessments, pursuant to the terms of agreements between the Debtor and

---

(Bankr. M.D. Fla. 1994) (observing that other provisions of the Bankruptcy Code—specifically, §§ 1107, 1322, and 522(h)—demonstrate that "when Congress wished for the debtor to have the authority to act it specifically provided for it.").

[3] As set forth in Section 1.1 of the Communications Agreement, Communications Services consists of two primary components: "Basic Services" and "Telephone and Premium Services."  Communications Agreement § 1.1.  The component particularly relevant to this Memorandum Opinion is defined as "Basic Services," which the residents of the Remington Park development were required pay for through the Debtor regardless of their intent to use such services.  *See id.* § 2.2.1.  "Basic Services" include "Internet Services" and "Video Services."  *Id.* § 1.1.  As more specifically defined in the Communications Agreement, "Internet Services" generally refers to basic tier internet access and "Video Services" generally refers to basic tier cable television service.  *Id.*  The Debtor and RIM did not arrange for "Telephone and Premium Services," which include optional services in excess of Basic Services that residents of the Remington Park development could seek out on an individual basis from any and all service providers and which would be governed by such individual subscription agreements.  *See id.* §§ 2.1.3, 2.2.2, 2.2.3.

each of the Homeowners (each a "Homeowners Agreement" and, collectively, the "Homeowners

Agreements"). *Id.* §§ 2.2.1, 3.1.  RIM engaged Charter to be the initial third-party service

provider of Communications Services by separate agreement with an effective date of July 24,

2008, under which Charter agreed to provide bulk internet and video services to the

Homeowners in exchange for a bulk billing fee paid solely by RIM.[4]  *See* Charter's Ex. 1,

Nonexclusive Installation and Service Agreement (Owner Prewire), Bulk Service Cable

Addendum, and Internet Services Bulk Rate Addendum (collectively, hereinafter, the "Bulk

Services Agreement") at 9.[5]

On July 21, 2014, the Chapter 7 Trustee moved for authorization to assume and assign

the Communications Agreement to IVMA pursuant to 11 U.S.C. § 365 in exchange for payment

---

[4] The Communications Agreement provides that RIM must contract with a third-party service provider for the provision of Communications Services, *see* Communications Agreement § 2.1; however, the Bulk Services Agreement is between Charter and Remington Park Infrastructure Management, LLC ("RPIM"), an entity with a slightly different name than RIM, *see* Bulk Services Agreement at 1.  In the Motion to Reconsider, Charter alleges that RPIM is the fictitious name used by KMWMDLJ, LLC, an affiliate of RIM, which shares common ownership with and management in the original developer of Remington Park.  Motion to Reconsider ¶ 11; *see also* Tr. at 38.  In the Objection, RIM and IVMA admit these allegations, Objection ¶ 11, but also explain that "notwithstanding the slight difference between the names of RIM and [RPIM], the goods and services that Charter supplied pursuant to the [Bulk Services Agreement] were supplied to RIM, that RIM paid Charter for those goods and services pursuant to the terms of the [Bulk Services Agreement], and that Charter provided those goods and services and accepted those payments without protest for years." *Id.* ¶ 9.  Based on the foregoing and because the name of the entity with whom Charter contracted under the Bulk Services Agreement has no direct bearing on Charter's arguments in support of its standing to bring the Motion to Reconsider, the Court makes no findings as to whether the identification of RPIM as the counterparty to the Bulk Services Agreement represents an unintended misnomer for RIM or whether the fictitiously-named RIM-affiliate was the intended counterparty to the Bulk Services Agreement.  For purposes of this Memorandum Opinion, the Court will refer to both RIM and RPIM as RIM for ease of reference.

[5] Since the Bulk Services Agreement is continuously paginated, but contains recurring section numbers across its several parts, all citation to the Bulk Services Agreement will be to the page number to promote clarity.

of $16,100.00 (the "Assignment Motion").[6]    The Chapter 7 Trustee provided notice of the

Assignment Motion to counsel for the Debtor, counsel for RIM and IMVA, and the Office of the

United States Trustee.    *See* Assignment Motion at 1-2.    No other party received notice, and the

record reflects that the Court did not direct that any other party receive notice.    *See* Fed. R.

Bankr. P. 6006(c).    Having received no objections to the Assignment Motion and following the

expiration of the notice period, the Court granted the requested relief by order entered August 28,

2014 (the "Assignment Order").

Approximately six months after entry of the Assignment Order, Charter filed the Motion

to Reconsider pursuant to Federal Rule of Civil Procedure 60, as incorporated into the Federal

Rules of Bankruptcy Procedure by Rule 9024.    *See* Motion to Reconsider at 1.    The Motion to

Reconsider does not clearly specify which subsection(s) of Federal Rule of Civil Procedure 60

forms the basis for the relief sought by Charter, though it recites the majority of the substance of

subsections (b)(1)-(3) and (6).[7]    *See id.* ¶ 18.    In support of its request for relief from the

---

[6]  On July 18, 2014, the Chapter 7 Trustee requested an extension of the sixty-day period provided for under 11 U.S.C. § 365(d)(1) to file the Assignment Motion.  By order entered July 23, 2014, the Court granted the Trustee until August 15, 2014, to file the Assignment Motion. The order was not appealed and, accordingly, the Assignment Motion filed on July 21, 2014, was considered timely.

[7]  The Court observes that in Charter's post-hearing briefing, Charter requests the Court vacate the order to Assume and Assign pursuant to Federal Rule of Civil Procedure 60(b)(1). *See* Mem. of Charter Communications VI, LLC in Supp. of Mot. for Relief from Order Granting Motion to Assume and Assign Executory Contract at 3-6, ECF No. 47.  Charter further contends that the Court "should vacate the [Assignment Order] pursuant to [Federal Rule of Civil Procedure] 60(b)(4) and 60(b)(6) because Charter did not receive sufficient notice pursuant to [the Federal Rules of Bankruptcy Procedure] and the United States Constitution, resulting in unfair prejudice to Charter and the [H]omeowners."  *Id.* at 7-8; *see also id.* at 9.  Charter did not reference or recite the provisions of Federal Rule of Civil Procedure 60(b)(4) in the Motion to Reconsider, but, as observed by the Court at the hearing in this matter, this basis for relief may be inferred from the nature of the arguments raised in the motion.  Tr. at 117; *see* Motion to Reconsider ¶ 19.

Assignment Order, Charter alleges that neither Charter nor the Homeowners were served with notice of the Assignment Motion, which "materially affect[ed] their rights and interests," *see id.* ¶ 6, and deprived Charter and the Homeowners of due process, *see id.* ¶ 19. More specifically, Charter contends that, because the Homeowners were advised to discontinue payment of the Service Fee for Basic Services and because the Debtor's rights to bill the Homeowners under their respective Homeowners Agreements were not assumed and assigned by the Chapter 7 Trustee to any entity, Charter established individual service agreements with some Homeowners. *Id.* ¶ 14-15. However, Charter further contends that confusion subsequently arose because RIM maintained that Charter was obligated to provide bulk services under the Bulk Services Agreement. *Id.* ¶ 16.

At the hearing held on the Motion to Reconsider on April 14, 2015, Charter's representative testified that Charter stopped providing bulk services to the Homeowners—or "debulked"—and began establishing individual service agreements with Homeowners based upon its belief that "the bulk agreement was no longer in place, that it had been voided because of the bankruptcy." Tr. at 68; *see also id.* at 69-70, 81. Charter's understanding was based in large part upon a letter from Debtor's counsel to the Homeowners dated June 2, 2014, advising the Homeowners to cease making payments to the Debtor for Basic Services and, instead, arrange for services directly. *Id.* at 70; *see also* Charter's Ex. 3, Letter from Robert V. Roussos dated June 2, 2014. Accordingly, because the Debtor was no longer willing to collect any monies from the Homeowners pursuant to the Homeowners Agreements, Charter was no longer

---

However, as discussed herein, the Court need not untangle the specific grounds upon which Charter seeks relief unless Charter has standing to pursue relief under Federal Rule of Civil Procedure 60(b).

willing to provide services in bulk.[8]  Tr. at 71-72; *see also* Motion to Reconsider ¶ 14.  Although the testimony of Charter's representative and that of RIM's representative differ as to whether Charter ultimately debulked in November 2014 or January 2015, the testimony from both representatives was consistent on the point that Charter had received payment from RIM for all of the months for which Charter provided bulk services, including any post-petition months.  *See* Tr. at 79, 105.

The Objection filed by RIM and IVMA was the only response to the Motion to Reconsider.  Principally, RIM and IVMA respond that (1) Charter lacks standing to seek reconsideration on the basis of any argument it asserts on behalf of the Homeowners, *see* Objection ¶ 6; and (2) Charter lacks standing to seek reconsideration because Charter is neither a party to nor a third-party beneficiary of the Communications Agreement, *see id.* ¶ 19.

## II.    Standing to Seek Relief Pursuant to Federal Rule of Bankruptcy Procedure 9024 and Federal Rule of Civil Procedure 60(b)

Before the Court can consider the merits of Charter's request for relief from the Assignment Order, the Court must first determine whether Charter has standing to seek reconsideration of the Assignment Order pursuant to Federal Rule of Civil Procedure 60(b), as incorporated into the Federal Rules of Bankruptcy Procedure by Rule 9024.  Federal Rule of Civil Procedure 60(b) provides that "[o]n motion and just terms, the court may relieve *a party or*

---

[8]  The Debtor separately scheduled 158 Homeowners Agreements as "rejected" on Schedule C - Executory Contracts and Unexpired Leases filed on May 22, 2014.  However, assuming *arguendo* that these agreements are executory contracts for purposes of 11 U.S.C. § 365, as the Court observed *supra*, the decision to assume or reject an executory contract in a chapter 7 case belongs to the chapter 7 trustee.  *See* 11 U.S.C. § 365(a).  The Chapter 7 Trustee did not file a motion seeking to assume or reject any of the many Homeowners Agreements between the Debtor and the Homeowners.  To the extent each Homeowners Agreement constitutes an executory contract, such contracts would be deemed rejected by the Chapter 7 Trustee by operation of law upon the expiration of the sixty-day period following the entry of the order for relief on May 22, 2014.  *See* 11 U.S.C. § 365(d)(1).

7

*its legal representative* from a final judgment, order, or proceeding . . . ."  (emphasis added).

Fed. R. Civ. P. 60(b).  Accordingly, under its plain language, Federal Rule of Civil Procedure

60(b) limits standing to a party or a party's legal representative.  *See id.*  While the term "party"

speaks for itself, the term "legal representative" refers to individuals in a position tantamount to

that of a party.  *Heyman v. M.L. Mktg. Co.*, 116 F.3d 91, 95 (4th Cir. 1997) (holding that a

chapter 7 trustee had standing to bring a Federal Rule of Civil Procedure 60(b) motion because

"[the chapter 7 trustee] is the '"party's legal representative'" because "[h]is fault is tantamount to

the fault of a party"); *see also Kem Mfg. Corp. v. Wilder*, 817 F.2d 1517, 1520 (11th Cir. 1987)

("The cases make clear that the term legal representative was intended to reach only those

individuals who were in a position tantamount to that of a party or whose legal rights were

otherwise so intimately bound up with the parties that their rights were directly affected by the

final judgment.") (citations omitted).

  As observed by Judge Robert G. Doumar of the United States District Court for the

Eastern District of Virginia, there is an absence of controlling precedent from the Fourth Circuit

Court of Appeals on the issue of whether standing under Federal Rule of Civil Procedure 60(b)

may be extended beyond the plain language of the rule.  *See Flame S.A. v. Indus. Carriers, Inc.*,

24 F. Supp. 3d 513, 515 (E.D. Va. 2014).  Taking no position on whether Federal Rule of Civil

Procedure 60(b) permits any flexibility, Judge Doumar further observed that other circuits have

afforded relief to nonparties in limited circumstances.  *Id.* (citing *Bridgeport Music, Inc. v. Smith*,

714 F.3d 932, 940 (6th Cir. 2013)).

  First, other circuits have recognized standing is available to a nonparty under Federal

Rule of Civil Procedure 60(b) if there is privity between the nonparty seeking relief and a party

to the original action.  *See, e.g.*, *Bridgeport Music, Inc. v. Smith*, 714 F.3d 932, 940 (6th Cir.

2013) (citing *Eyak Native Vill. v. Exxon Corp.*, 25 F.3d 773, 777 (9th Cir. 1994); *Kem*, 817 F.2d

at 1520; *Hasso v. Mozsgai* (*In re La Sierra Fin. Servs., Inc.*), 290 B.R. 718, 724-31 (B.A.P. 9th

Cir. 2002)); *Almoguera v. Allstate Ins. Co.*, 923 F.2d 861, 861 (9th Cir. 1981); *Nat'l Acceptance*

*Co. of Am. v. Frigidmeats, Inc.*, 627 F.2d 764, 766 (7th Cir. 1980) (citing 11 Fed. Prac. & Proc.

Civ. § 2865 at 225-26 (1973)).  "Privity" may be defined as follows:

> "'Privity'" . . . is a legal conclusion 'designating a person so identified in
> interest with a party to former litigation that he represents precisely the same right
> in respect to the subject matter involved.'" *United States v. Schimmels* (*In re
> Schimmels*), 127 F.3d 875, 881 (9th Cir. 1997) (quoting *Southwest Airlines Co. v.
> Tex. Int'l Airlines, Inc.*, 546 F.2d 84, 94 (5th Cir. 1977) and defining "privity" for
> purposes of claim preclusion).  *See also* [*Kem*], 817 F.2d at 1520 ("[T]he term
> legal representative was intended to reach only those individuals who were in a
> position tantamount to that of a party or whose legal rights were otherwise so
> intimately bound up with the parties that their rights were directly affected by the
> final judgment.").

> A party in privity is bound in the same way the party is bound. *See Rivet v.
> Regions Bank of La.*, 522 U.S. 470, 476 (1998) ("Under the doctrine of claim
> preclusion, '[a] final judgment on the merits of an action precludes the parties or
> their privies from relitigating issues that were or could have been raised in that
> action.'").

*Hasso v. Mozsgai* (*In re La Sierra Fin. Servs., Inc.*), 290 B.R. 718, 729 (B.A.P. 9th Cir. 2002)

(second and third alterations in original); *see also Nash Cty. Bd. of Educ. v. Biltmore Co.*, 640

F.2d 484, 493 (4th Cir. 1981) (quoting *Jefferson Sch. of Soc. Sci. v. Subversive Activities Control*

*Bd.*, 331 F.2d 76, 83 (D.C. Cir. 1963)); *Mobay Chem. Co. v. Hudson Foam Plastics Corp.*, 277

F. Supp. 413, 416-17 (S.D.N.Y. 1967) (citations omitted) ("Privity between persons denotes the

relationship arising out of mutual rights or successive rights in the same property of interest, as,

for example, successors in a particular office, or assignee and assignor, or executor and

testator.").

For example, in *In re La Sierra Financial Services, Inc.*, a nonparty subsequent purchaser

of real property sought reconsideration of a court order that revived a lien on the real property,

arguing, in part, that its property interest was identical to that of prior purchasers of the real property who were interested parties to the order and whose due process rights were violated for lack of notice of the order.  290 B.R. at 728.  The Ninth Circuit Bankruptcy Appellate Panel determined the nonparty subsequent purchaser possessed "precisely the same property interest" as previously held by the prior purchasers.  *Id.* at 729.  Accordingly, the subsequent purchaser was in privity with the prior purchasers and had standing to file a motion to vacate the order pursuant to Federal Rule of Civil Procedure 60(b) to assert a violation of the prior purchasers' due process rights.  *Id.*

The Eleventh Circuit Court of Appeals has questioned whether privity operates as an exception to the standing limitation imposed by the plain language of Federal Rule of Civil Procedure 60(b):  "It is not clear that the privity exception does any more than restate in different language the rule that persons tantamount to a party may be allowed standing."  *Kem*, 817 F.2d at 1520; *see also Pedraza v. United Guar. Corp.*, No. CV199-239, 2001 WL 37071198, at *3 (S.D. Ga. Sept. 19, 2001) ("The privity exception advocated by [o]bjectors is simply a restatement of Rule 60's allowance of standing for 'a party's legal representative.'").  For example, in *County of Oakland v. Vista Disposal, Inc.*, 840 F. Supp. 75 (E.D. Mich. 1993), the court applied the privity standard articulated in *Kem* in arriving at its holding that the United States lacked standing as a party's legal representative under Federal Rule of Civil Procedure 60(b) to seek relief from a default judgment order entered in a civil Racketeer Influenced & Corrupt Organization Act, 18 U.S.C. § 1961 *et seq.* ("RICO") suit filed by a county against a corporation.  840 F. Supp. at 76-77.  The United States sought to set aside the default judgment order, believing it might have preclusive effect in remission proceedings filed by the county to recover assets forfeited by the corporation to the United States in criminal forfeiture proceedings.  *Id.* at 76.  The court

10

determined that the United States possessed a "distinctly different" interest in the assets that was derived from criminal RICO penalties and that its interest was adversarial to the corporation. *Id.* at 76-77. Accordingly, the Court concluded that the United States lacked standing to seek relief from the judgment because it was neither "in a position tantamount to that of [the corporation] with respect to [the county's] claim" nor were its rights "so intimately bound up with [the corporation's] rights that it may be allowed to act as the legal representative of [the corporation] for purposes of defending [the corporation] against [the county's] RICO claim." *Id.* at 77.

Accordingly, while the Fourth Circuit has not issued any decisions that would expand standing beyond the confines of Federal Rule of Civil Procedure 60(b)'s plain language, the decided cases from outside the Fourth Circuit suggest that privity merely provides a path to nonparty standing under the existing rule. Under these holdings, Charter will have standing to challenge the Assignment Order only if it is a party to the Assignment Order or in privity with such a party such that it may act as its legal representative.

Additionally, courts outside the Fourth Circuit have permitted standing to invoke Federal Rule of Civil Procedure 60(b) if a nonparty's rights or interests were "directly or strongly affected by the judgment" or "sufficiently connected and identified with" the underlying proceeding. *See, e.g.*, *Bridgeport Music*, 714 F.3d at 940-41 (citing *Grace v. Bank Leumi Trust Co. of N.Y.*, 443 F.3d 180, 188-89 (2d Cir. 2006); *Binker v. Pennsylvania*, 977 F.2d 738, 745 (3d Cir. 1992); *Dunlop v. Pan Am. World Airways, Inc.*, 672 F.2d 1044, 1052 (2d Cir. 1982)); *In re La Sierra Fin. Servs., Inc.*, 290 B.R. at 730-31. The Court observes that this avenue to nonparty standing presents some conceptual overlap with the principles of privity in that a court must examine the rights or interests at stake and the effect of the judgment thereon; however, this "exceedingly narrow exception" permits nonparties to achieve standing independently rather

11

than via an identity of interest with a party to the proceeding. *See Grace v. Bank Leumi Trust Co. of N.Y.*, 443 F.3d 180, 189 (2d Cir. 2006). So, if Charter's rights or interests were directly or strongly affected by the Assignment Order or sufficiently connected and identified with the underlying proceeding, it may have standing to challenge the Assignment Order on this basis.

In a similar vein, a nonparty also has standing to challenge a judgment under Federal Rule of Civil Procedure Rule 60(b)(4) on due process grounds if the nonparty's property rights were affected. *See Owens-Corning Fiberglass Corp. v. Ctr. Wholesale, Inc.* (*In re Ctr. Wholesale, Inc.*), 759 F.2d 1440, 1445 (9th Cir. 1985) ("To have standing to bring a Rule 60(b) motion challenging the [order] on due process grounds, [the creditor] must show that it had property rights affected by the [order]."). In *Center Wholesale*, a creditor, who was not a party to a cash collateral order, challenged the order as void for denial of due process pursuant to Federal Rule of Civil Procedure 60(b)(4) on the basis that it possessed a junior security interest in the collateral, but did not receive sufficient notice of the hearing at which the court approved the cash collateral order. *Id.* at 1444. The creditor alleged the cash collateral order authorized the debtor to take action that directly affected the creditor's claimed security interest. *See id.* Recognizing that the creditor must establish it had property rights affected by the cash collateral order to obtain standing to raise a due process challenge to the order under Federal Rule of Civil Procedure 60(b) and observing that the bankruptcy court had not made any factual findings as to "whether [the creditor] had property rights and to what extent those rights were affected by the [order]," the Ninth Circuit remanded "for these crucial findings." *See id.* at 1445.[9] Thus,

---

[9] The court assumed the existence and valuation of the creditor's junior security interest in the collateral for purposes of resolving the remaining questions of law on appeal. *In re Ctr. Wholesale, Inc.*, 759 F.2d at 1446. On the basis of this assumption, the court then evaluated the merits of the creditor's due process challenge. *See id.* at 1449-50.

consistent with the plain language of the Due Process Clause of the United States Constitution,[10]

a court must find that a nonparty has property rights affected by the challenged order to afford it

standing to bring a Federal Rule of Civil Procedure 60(b) motion for denial of due process.

Here, if Charter can establish it possessed a property interest affected by the Assignment Order,

it may establish standing to challenge the Assignment Order pursuant to Federal Rule of Civil

Procedure 60(b) on due process grounds.

Finally, courts have also held that a nonparty has standing to seek relief from a judgment

or order based on fraud.  *See, e.g.*, *Eyak Native Vill. v. Exxon Corp.*, 25 F.3d 773, 777 (9th Cir.

1994) (citing *Kem*, 817 F.2d at 1521; *Southerland v. Irons*, 628 F.2d 978, 980 (6th Cir. 1980)).

A nonparty may invoke Federal Rule of Civil Procedure 60(b) on the basis of fraud if it can

establish its "rights were directly compromised by the final judgment."  *Kem*, 817 F.2d at 1521.

However, Charter's arguments do not implicate the fraud exception for nonparties Federal Rule

of Bankruptcy Procedure 60(b)(3) nor has Charter asserted in this proceeding that the

Assignment Order was induced by fraud.[11]

In its post-hearing briefing, Charter contends its standing to obtain relief pursuant to

Federal Rule of Civil Procedure 60(b) is derived from a nexus between Charter, the Debtor, and

RIM, such that the Assignment Order caused a significant impact on Charter.  *See* Mem. of

Charter Communications VI, LLC in Supp. of Mot. for Relief from Order Granting Mot. to

Assume and Assign Executory Contract at 10, ECF 47 (hereinafter "Charter's Opening Brief").

---

[10] "No person shall be . . . deprived of life, liberty, or *property*, without due process of
law . . . ."  U.S. Const. amend V (emphasis added).

[11] The Court notes that Charter omitted fraud from its summary of the substance of the
grounds for relief under Federal Rule of Civil Procedure 60(b)(3) in the Motion to Reconsider.
Motion to Reconsider ¶ 18.  Since Charter has not alleged this basis for relief, the Court need not
consider whether Charter has nonparty standing on this basis.

To illustrate the impact of the Assignment Order upon Charter and its standing to seek relief from the Assignment Order under Federal Rule of Civil Procedure 60(b), Charter cites certain principles and theories of contract law, including "the law regarding third-party beneficiaries, frustration of contractual purpose, and integrated contracts." *Id.* at 11. It is on these bases that Charter alleges it should have received notice of the Assignment Motion in the first instance. *Id.* Accordingly, Charter further asserts it has standing to seek relief from the Assignment Order Federal Rule of Bankruptcy Procedure 60(b)(4) and 60(b)(6) because it did not receive notice and due process. *Id.* at 7-8; *see also* Tr. at 35.

As noted above, the Fourth Circuit has provided no precedent on whether Federal Rule of Civil Procedure 60(b)'s limitation on standing to a party or a party's legal representative is subject to any exception. To the extent the Fourth Circuit would permit nonparty standing under Federal Rule Civil Procedure 60(b) pursuant to any of the exceptions discussed above, the Court must consider whether any of the legal theories or principles raised by Charter cause it to satisfy the requirements for nonparty standing under the decided cases. Ultimately, the Court need not speculate as to the Fourth Circuit's willingness to adopt a flexible interpretation of Federal Rule of Civil Procedure 60(b), because, for the reasons stated below, Charter's arguments do not support a finding that Charter has nonparty standing to seek relief from the Assignment Order.

**a.   Whether Charter Has Standing to Seek Relief Pursuant to Federal Rule of Civil Procedure 60(b) as an Intended Third-Party Beneficiary of the Communications Agreement**

Charter contends it may seek relief from the Assignment Order pursuant to Federal Rule of Civil Procedure 60(b) because it is an intended third-party beneficiary of the Communications Agreement. Charter's Opening Brief at 11; *see also* Tr. at 37. Charter argues that its alleged intended third-party beneficiary status establishes privity of contract and shared rights between Charter, the Debtor, and RIM, and affords Charter enforceable rights in the Communications

14

Agreement such that its interests must be protected.   Charter's Opening Brief at 14.
Accordingly, Charter claims it should have received notice of the Assignment Motion in the first
instance and, correspondingly, has standing to seek relief from the Assignment Order now.  *Id.* at
14-15.

To establish its intended third-party beneficiary status under the Communications
Agreement, Charter relies on references to Charter in the definitions of "Internet Services,"
"Service Provider," and "Video Services," in Section 1.1 of the Communications Agreement.
*See id.* at 11-12; *see also* Tr. at 37.  Specifically, Section 1.1 of the Communications Agreement
provides as follows:

> "Internet Services" shall mean services which permit access to the
> worldwide system of computer networks as originally conceived by the Defense
> Advance Research Project Agency (DARPA) and as such service continues to
> evolve.  Technically it is distinguished by its use of the Internet Protocol (IP),
> offering local and global connectivity and applications.  IP based applications,
> such as email, www, hypertext, browsing, dial transfer, Internet chat, and Internet
> telephony, are considered Internet applications.  Initially, Internet Services shall
> consist only of those Internet Services available through Charter Communications
> VI, LLC, at the basic tier internet service level[.]
>
> . . .
>
> "Service Provider" shall mean the company or companies selected by RIM
> to provide one or more of the Communications Services.  Initially, the Service
> Provider shall be Charter Communications VI, LLC.
>
> . . .
>
> "Video Services" shall mean services that provide traditional video
> programming throughout the Development in either analog or digital format.  This
> includes programming sources received *via* satellite and off air local transmission.
> Also included may be advanced services such as pay per view, video on demand,
> interactive television, gaming and web enabled television.   Initially, Video
> Services shall consist only of those Video Services available through Charter
> Communications VI, LLC, at the basic tier cable service level, which includes
> approximately 70 channels.

Communications Agreement § 1.1.  RIM and IVMA dispute that Charter is an intended third-party beneficiary, arguing that references to Charter in the Communications Agreement are not dispositive of intended third-party beneficiary status and that any benefit to Charter is incidental when considered in context with its other provisions.  *See* Reply Br. of Remington Infrastructure Management and Infrastructure Management VA at 5-6, ECF No. 49.  Charter argues that the express identification of Charter as the initial third-party service provider effectuates the parties' intention of providing Basic Services to the Homeowners in bulk, and RIM's negotiation of and entrance into the Bulk Services Agreement with Charter in accordance with the Communications Agreement gave an intended benefit to Charter.  Charter's Opening Brief at 12-13; *see also* Communications Agreement § 2.1 (requiring RIM to negotiate and enter into a bulk service agreement with a third-party service provider).  However, for the reasons stated below, the Court finds that Charter's argument is misguided and inconsistent with Virginia third-party beneficiary law.

The Communications Agreement provides that it will be construed, governed, and enforced in accordance with Virginia law.  *See* Communications Agreement § 6.6.  A bankruptcy court applies the choice of law rules of the forum state to decide issues of state law.  *Compliance Marine, Inc. v. Campbell* (*In re Merritt Dredging Co.*), 839 F.2d 203, 206 (4th Cir. 1988).  Virginia choice of law principles will give effect to a governing law clause in a contract to decide issues of contract interpretation, including whether a nonparty is a third-party beneficiary of a contract.  *Stanworth v. Cotter* (*In re Stanworth*), 543 B.R. 760, 772-73 (Bankr. E.D. Va. 2016) (citing *Canal Ins. Co. v. Lebanon Ins. Agency, Inc.*, 504 F. Supp. 2d 113, 119 (W.D. Va. 2007)).  Accordingly, the Court will apply the law of Virginia to determine whether Charter is an intended third-party beneficiary of the Communications Agreement.

16

Under Virginia law, a third-party beneficiary is an intended third-party beneficiary if it can "show by the evidence that the parties to the contract clearly and definitely intended to confer a direct benefit upon [the third party]." *Kelley v. Griffin*, 471 S.E.2d 475, 477 (Va. 1996) (citing *Aetna Cas. and Sur. Co. v. Fireguard Corp.*, 455 S.E.2d 229, 232 (Va. 1995); *Ward v. Ernst & Young*, 435 S.E.2d 628, 635 (Va. 1993); *Valley Landscape Co. v. Rolland*, 237 S.E.2d 120, 122 (Va. 1977)).  However, an incidental beneficiary of a contract is not an intended third-party beneficiary and lacks standing to sue on a contract.  *Id.* (citing *Copenhaver v. Rogers*, 384 S.E.2d 593, 596 (Va. 1989); *Valley Landscape Co. v. Rolland*, 237 S.E.2d 120, 122 (Va. 1977); *N.-P. Newspapers v. Stott*, 156 S.E.2d 610, 612 (Va. 1967)).  As further explained by the Virginia Supreme Court, "[t]he essence of a third-party beneficiary's claim is that others have agreed between themselves to bestow a benefit upon the third party . . . ."  *Copenhaver v. Rogers*, 384 S.E.2d 593, 596 (Va. 1989); *see also Radosevic v. Va. Intermont Coll.*, 651 F. Supp. 1037, 1038 (W.D. Va. 1987) ("This distinction [between incidental and intended beneficiaries] rests upon the basic premise of the law of contracts that a court will not enforce a contract absent two mutually bargained for considerations; and consequently, courts will not impose an additional unbargained for obligation on a contracting party.").  The Restatement (Second) of Contracts § 302 is also instructive as to the distinction between an intended beneficiary and an incidental beneficiary of a contract:

> (1)  Unless otherwise agreed between promisor and promisee, a beneficiary of a promise is an intended beneficiary if recognition of a right to performance in the beneficiary is appropriate to effectuate the intention of the parties and either
>
>> (a)  the performance of the promise will satisfy an obligation of the promisee to pay money to the beneficiary; or
>>
>> (b)  the circumstances indicate that the promisee intends to give the beneficiary the benefit of the promised performance.

(2)  An incidental beneficiary is a beneficiary who is not an intended beneficiary.

Restatement (Second) of Contracts § 302 (1981).  In Virginia, courts generally look to the "four

corners" of a contract to determine if one is an intended third-party beneficiary.  *See Obenshain*

*v. Halliday*, 504 F. Supp. 946, 956 (E.D. Va. 1980) (citing *Richmond Shopping Ctr., Inc. v. Wiley*

*N. Jackson Co.*, 255 S.E.2d 518 (Va. 1979)).

The decision of the Fourth Circuit Court of Appeals in *BIS Computer Solutions, Inc. v.*

*Halifax Corp.*, 122 F. App'x 608 (E.D. Va. 2006), provides an illustration of the third-

beneficiary doctrine directly applicable to the instant case as the court considered the factual

scenario of a contract that identifies a third-party who will be engaged to assist in performance.

In *BIS*, the Fourth Circuit reviewed whether a subcontractor was a third-party beneficiary to a

services contract between a computer company and a city such that it was entitled to sue on the

contract as a matter of law. 122 F. App'x at 609.  The contract between the computer company

and the city was a services contract "for the creation, installation, and maintenance of a

computerized records management system for the [city's police department]."  *Id.* at 608; *see*

*also id.* at 611.  The computer company received compensation from the city in exchange for its

services.  *Id.* at 611.  The contract expressly identified the subcontractor as having been

"'engaged . . . to meet certain of [the computer company's] requirements and responsibilities

under the terms of [the contract]'" and prevented the computer company from changing the

subcontractor without written approval from the city. *Id.* at 610.  The computer company and the

subcontractor entered into a separate agreement.  *Id.*  Applying the same principles of Virginia

third-party beneficiary law discussed above, the Fourth Circuit resolved the third-party

beneficiary issue in *BIS* as follows:

> [I]t is clear that, as a matter of law, [the subcontractor] was merely an incidental
> third-party beneficiary of the contract.   While  the  recognition  of  [the

subcontractor] as a subcontractor may have added to the [c]ity's comfort in being assured that performance of the contract would be satisfactorily completed, the [c]ity surely did not secure a records management system in order to benefit [the subcontractor] or any other subcontractor.  It did so solely to benefit itself and its police department, and any benefit to [the subcontractor] and other subcontractors was incidental.  For example, in *Valley Landscape Co., Inc. v. Rolland*, 237 S.E.2d 120 (Va. 1977), the Supreme Court of Virginia explained that the primary purpose of a contract between a property owner and an architect was "to assure that the owner [would] get a finished product in accordance with the plans" he had approved. *Id.* at 122.  Therefore, the court held, a contractor of the owner could not bring suit as an intended third-party beneficiary against the architect. *Id.* at 124.  Similarly in this case, the primary purpose of the contract between the [c]ity and [the computer company] was to assure that the [c]ity would receive a working records management system for its police department in accordance with the contractual specifications, and [the subcontractor] cannot bring suit as an intended third-party beneficiary.

*Id.* at 612 (eighth alteration in original).  The court also drew parallels between the contract at issue and standard construction contracts involving subcontractors under which the sole intended beneficiaries are the property owners and contractors, while the subcontractors are merely incidental beneficiaries.  *Id.*  Thus, the court acknowledged that "[w]ere we to hold that [the subcontractor] was an intended beneficiary of the contract between the [c]ity and [the computer company], we would be broadening the third-party beneficiary doctrine inappropriately."  *Id.* The court further observed that if the computer company fails to pay the subcontractor as expected under their separate agreement, "that is a matter between them."  *Id.*

The parallels between the facts of the *BIS* decision and the instant case are undeniable. Similar to the contract at issue in *BIS,* which identified a third-party who would be retained to perform certain requirements of the contract, the Communications Agreement identifies Charter to be engaged as the initial third-party service provider and limits the type of Basic Services initially available to the Homeowners to those offered by Charter.  The references to Charter in Section 1.1 of the Communications are undoubtedly overt.  However, these recitals must be considered in light of the contractual purpose.  Accordingly, like the Fourth Circuit in *BIS*, the

19

Court will look to the purpose of the Communications Agreement to determine if Charter is an intended third-party beneficiary.

As discussed above, the Communications Agreement's purpose was to make Communication Services available to the Homeowners by establishing a telecommunications infrastructure and coordinating services. This purpose is first reflected in the recitals.[12] *See* Communications Agreement at 1. The contractual purpose is further indicated in the terms of RIM's engagement, which provide that the Debtor will engage RIM as its agent to coordinate the design, installation, and operation of the telecommunications infrastructure and coordinate, manage, and monitor the provision of Communication Services to the Homeowners via a third-party service provider. *See id.* § 2.1. No litigant has disputed this is the purpose of the Communications Agreement, and Charter itself identified this contractual purpose in its own papers. *See* Charter's Opening Brief at 12 ("[T]he intention of the named parties to the [Communications Agreement], RIM and the Debtor, was to provide discounted internet and video services to [the Homeowners], but RIM and the Debtor could not provide those services themselves.").

Charter's argument that it is an intended third-party beneficiary of the Communications Agreement by reason of its identification as the initial third-party service provider or the initial limitation of Basic Services to those available through Charter loses sight of the agreement's purpose by divorcing the specific references to Charter, which define Charter's function as the initial third-party service provider, from the Communications Agreement as a whole. Irrespective of the express references to Charter in the Communications Agreement, there are

---

[12] In the recitals, the parties state that "[t]he [Remington Park Owners] Association desires to engage RIM to act as its agent to manage and coordinate the provision of the Communications Services to the Development . . . ." Communications Agreement at 1.

neither allegations nor evidence in the record that establish that the Debtor and RIM entered into the Communications Agreement so that they could bestow a benefit upon Charter. Indeed, such an interpretation would bely common sense. Further, although identification of Charter as the initial third-party service provider and initial limitation of the Basic Services to those offered by Charter may have provided the baseline for services under the Communications Agreement or some initial "assur[ance] that performance of the contract would be satisfactorily completed," any benefit to Charter as the initial third-party service provider is merely incidental. *See BIS*, 122 F. App'x at 612. This is the very distinction noted by the Fourth Circuit in *BIS* in reaching its holding. *See id.* Accordingly, the Court finds that the Communications Agreement was intended to benefit only the Debtor, RIM, and, arguably, the Homeowners.

The Court, therefore, finds that Charter is not an intended third-party beneficiary of the Communications Agreement. Accordingly, the Court need not determine whether intended third-party beneficiary status provides an avenue to obtain nonparty standing to invoke Federal Rule of Civil Procedure 60(b) under the decided cases.

**b. Whether Charter Has Standing to Seek Relief Pursuant to Federal Rule of Civil Procedure 60(b) Because the Bulk Services Agreement is Part of a Single, Integrated Transaction**

Charter contends that it has standing to seek reconsideration of the Assignment Order pursuant to Federal Rule of Civil Procedure 60(b) because the Communications Agreement, Bulk Services Agreement, and Homeowners Agreements constitute a single, integrated transaction, which necessitated notice to Charter as an "interested party." Charter's Opening Brief at 24. Though Charter also raises this argument to challenge the validity of the Assignment

21

Order, the Court considers it here only as it relates to Charter's standing to seek reconsideration.[13]

Charter alleges that because each contract performed a function in achieving the goal of providing discounted bulk services to the Homeowners, these agreements evince the parties to the contracts' collective intent to "work together through a series of interdependent agreements." *Id.* at 23. Relevant to Charter's standing to seek reconsideration of the Assignment Order under this theory is whether the Bulk Services Agreement, to which Charter is a party, is integrated with the Communications Agreement between RIM and the Debtor, which was assumed and assigned by the Chapter 7 Trustee. Whether the Homeowners Agreements—numerous agreement to which Charter is not a party[14]—are also part of an integrated transaction with these two other agreements does not directly bear upon Charter's standing under Federal Rule of Civil Procedure 60(b).

The Communications Agreement and Bulk Services Agreement both provide they will be governed by Virginia law. *See* Communications Agreement § 6.6; Bulk Services Agreement at 8. As discussed above, the Court will apply Virginia law. The Virginia Supreme Court has provided the following guidance with respect to whether separate contracts constitute a unified transaction: "Where two papers are executed at the same time or contemporaneously between the same parties, in reference to the same subject-matter, they must be regarded as parts of one

---

[13] In Charter's Opening Brief, Charter contends the Communications Agreement, Bulk Services Agreement, and Homeowners Agreements were part of a single transaction such that the Chapter 7 Trustee could not separately assume and assign the Communications Agreement. *See* Charter's Opening Brief at 21-22. Since this argument relates to the merits of whether the Court should reconsider the Assignment Order, not Charter's standing to seek reconsideration, the Court will not address it here.

[14] The Homeowners Agreements are agreements made between individual Homeowners and the Debtor, which Homeowners executed upon the closing of their homes. *See* Communications Agreement § 2.2.1.

transaction and receive the same construction as if their several provisions were in one and the same instrument." *Oliver Ref. Co. v. Portsmouth Cotton Oil Ref. Corp.*, 64 S.E. 56, 59 (Va. 1909); *see also Bailey v. Hannibal & St. J.R. Co.*, 84 U.S. 96, 108 (1872). However, regardless of whether separate contracts are executed on different dates or are among different parties, if the contracts contain internal cross-references, "they will constitute a single contract as long as they involve the same subject matter and prove to be parts of an entire transaction." *Hampton Rds. Shipping Ass'n v. Int'l Longshoremen's Ass'n*, 597 F. Supp. 709, 716 (E.D. Va. 1984) (citing *Commercial Contractors, Inc. v. U.S. Fid. & Guar. Co.*, 524 F.2d 944, 950 (5th Cir. 1975); *Gordon v. Vincent Youmans, Inc.*, 358 F.2d 261 (2d Cir. 1965)). Internal cross-references "need not be explicit; it is sufficient if [they are] fairly traceable." *Texas Co. v. Northup*, 153 S.E. 659, 662 (Va. 1930). A court's determination of whether separate contracts constitute a single, integrated agreement is specific to the facts of the case. *Parr v. Alderwoods Grp., Inc.*, 604 S.E.2d 431, 435 (Va. 2004).

Although both contracts address the provision of Basic Services and certain other optional telecommunications services to the Homeowners, Virginia law requires more to establish that separate contracts are part of a single transaction. The agreements at issue here do not satisfy the requirements outlined above.

First, the Bulk Services Agreement and the Communications Agreement were not contemporaneously executed nor are they among the same parties. The Communications Agreement was made as of January 10, 2007, *see* Communications Agreement at 1, 15, while the Bulk Services Agreement has an effective date of July 24, 2008, nearly nineteen months later, *see* Bulk Services Agreement at 8, 12, 18. Further, the Communications Agreement is a contract

between the Debtor and RIM, *see* Communications Agreement at 1; whereas, the Bulk Services Agreement is a contract between RIM and Charter, *see* Bulk Services Agreement at 1.

Second, the Bulk Services Agreement does not contain any reference to the Communications Agreement. Similarly, the Communications Agreement does not cross-reference the Bulk Services Agreement. Instead, the Communications Agreement merely references Charter as the initial third-party service provider and otherwise references bulk service agreements generally, in accordance with RIM's ability to enter into future bulk service agreements with other third-party service providers who may succeed Charter. *See, e.g.*, Communications Agreement § 2.1 ("RIM shall (1) select the Service Provider(s) . . . ; (2) negotiate and enter into bulk service agreements with such Service Provider(s) consistent with the terms hereof; and (3) terminate any designated Service Provider(s) and replace any designated Service Provider(s) with another Service Provider consistent with the terms of this Agreement and the service agreements with such Service Provider(s).").

Relatedly, the Bulk Services Agreement has an initial term of ten years subject to automatic one-year renewals unless it is terminated by either party on proper notice, *see* Bulk Services Agreement at 10-11; whereas the Communications Agreement has an initial term of twenty-five years subject to automatic ten-year renewals up to a maximum aggregate term of seventy-five years unless it is terminated by RIM on proper notice, *see* Communications Agreement § 4.1. Thus, the Communications Agreement's initial term far exceeds that of the Bulk Services Agreement, further indicating that the Communications Agreement can survive without the Bulk Services Agreement between Charter and RIM, consistent with RIM's ability to select and contract with alternative third-party providers for the Communications Services following its initial contract with Charter. Given that RIM may enter into future bulk services

agreements with other third-party service providers over the course of the Communications Agreement's term, the fact that the Bulk Services Agreement is the first of any number of these agreements between RIM and a third-party service provider *a fortiori* does not cause the Bulk Services Agreement and the Communications Agreement to be so inextricably intertwined that they constitute a single, integrated transaction.

Further, the Communications Agreement contains an integration clause, which states that the Communications Agreement represents the entire agreement between RIM and the Debtor with respect to the subject matter and that it may only be amended by written agreement executed by the Debtor and RIM.[15]  *Id.* § 6.11; *see also* Rebuttal Br. of Remington Infrastructure Management and Infrastructure Management VA at 7, ECF No. 51.  If a contract contains an integration clause, absent ambiguity, it is presumed the contract is fully integrated.  *See Spotsylvania Cty. Sch. Bd. v. Seaboard Sur. Co.*, 415 S.E.2d 120, 126 (Va. 1992).  The Court does not find any ambiguity in the terms or scope of the Communications Agreement.  The integration clause in the Communications Agreement thus disclaims the notion that the Bulk Services Agreement in any way modifies the scope of the Communications Agreement to encompass the separate agreement between RIM and Charter.

For the foregoing reasons, the Court finds that Charter cannot establish that the Bulk Services Agreement is integrated with the Communications Agreement such that Charter would be a party to a larger, integrated transaction that includes both contracts.  Accordingly, the Court

---

[15] The integration clause in the Communications Agreement provides as follows: "This Agreement represents the entire agreement of the parties with respect to the subject matter hereof and may be amended only by written amendment executed by the undersigned parties.  All exhibits to this Agreement are intended to be attached to this Agreement and, whether or not so attached, are incorporated into this Agreement by reference.  Communications Agreement § 6.11.  The Bulk Services Agreement contains a similar provision with respect to agreements of the parties regarding subject matter of that agreement.  Bulk Services Agreement at 7.

concludes that Charter cannot obtain standing to invoke Federal Rule of Civil Procedure 60(b) under this theory.

### c. Whether Charter Has Standing to Seek Relief Pursuant to Federal Rule of Civil Procedure 60(b) on the Basis of Charter's Interests Under the Bulk Services Agreement

Having determined that Charter does not possess any enforceable rights in the Communications Agreement either as an intended third-party beneficiary to that contract or a party to an integrated transaction that includes the Communications Agreement, the Court now turns to Charter's contention that it has standing to seek reconsideration of the Assignment Order on the basis that the order directly affected Charter's pecuniary interests under the Bulk Services Agreement.  To illustrate the impact of the Assignment Order on Charter's interests, Charter first offers the doctrine of frustration of purpose as an "independent legal framework" to assess standing.   Charter's Opening Brief at 15.   On this theory, Charter seeks to demonstrate interdependence between the Communications Agreement, the Bulk Services Agreement, and the Homeowners Agreements on the basis of its assertion that the Debtor's chapter 7 bankruptcy filing frustrated the purpose of these contracts.  *See id.* at 19 ("The Debtor's failure to operate was not regarded as within the risks assumed by the parties under the three contracts governing services at Remington Park.  None of the contracts addresses how services would be provided in the event of a bankruptcy filing by, dissolution of or cessation of operations by the Debtor. Rather, the contracts assume that the Debtor will continue to exist and serve as the conduit for provision of bulk services to the [H]omeowners.").  In particular, Charter emphasizes that the Homeowners were unable to continue to purchase Basic Services through the Debtor following the chapter 7 bankruptcy filing pursuant to the Homeowners Agreements and the Communications Agreement thus undermining Charter's fundamental purpose of entering into the Bulk Services Agreement and its pecuniary interests under that agreement.  *Id.* at 18-19.

Charter's application of the doctrine of frustration of purpose to the facts of this case is

purely theoretical as the issues of whether and under what circumstances the parties to the Bulk

Services Agreement might be excused from performance of their obligations are not before this

Court and may not be suitable for determination in this forum at all.   Indeed, whether Charter

could successfully raise frustration of purpose or any affirmative defense to a claim for breach of

the Bulk Services Agreement is a matter of state law that has, at most, a tangential impact on the

Debtor's bankruptcy estate.   Thus, the Court concludes that the doctrine of frustration of purpose

has no practical application to this matter and will make no theoretical holdings on matters not

before it.   The Court will, however, consider the underlying premise of Charter's argument: that

Charter is entitled to seek relief from the Assignment Order because it possessed a "strong

interest" in the Assignment Motion and its pecuniary interests and rights under the Bulk Services

Agreement were directly affected by the entry of the Assignment Order because of a "symbiotic

relationship" among multiple contracts.[16]  *Id.* at 21.

---

[16] In its argument on frustration of purpose, Charter contends that its pecuniary interests
and rights are "'so intimately bound up with [RIM] that [Charter's] rights were directly affected
by the [Assignment Order].'"   Charter's Opening Brief at 15 (quoting *In re La Sierra Fin. Servs.*,
290 B.R. at 729; *Kem*, 817 F.2d at 1520); *see also* Tr. 35, 37.   However, Charter's invocation of
the quoted text severs it from its intended context.   In *Kem*, the Eleventh Circuit stated: "The
cases make clear that *the term legal representative* was intended to reach only those individuals
who were in a position tantamount to that of a party or whose legal rights were otherwise *so
intimately bound up* with the parties that their rights were *directly affected* by the final
judgment."  *Kem*, 817 F.2d at 1520 (emphasis added).   In *In re La Sierra Financial Services*, the
court adopted the language from *Kem* in its discussion of privity.  *In re La Sierra Fin. Servs.*, 290
B.R. at 729.   As the Court has already discussed *supra*, courts have regarded privity as simply
defining the standard for standing as a party's legal representative under the plain language of
Federal Rule of Civil Procedure 60(b).  *See Kem*, 817 F.2d at 1520; *Pedraza v. United Guar.
Corp.*, No. CV199-239, 2001 WL 37071198, at *3 (S.D. Ga. Sept. 19, 2001).

However, Charter does not invoke this language to contend that it has a legal relationship
with a party or that it possesses legal rights and interests so identified with a party that Charter
may stand in the party's stead as its legal representative with respect to the Assignment Order.
Charter instead misuses the quoted language.   It argues an overly broad interpretation of *Kem* in

Rather than addressing the impact of the Assignment Order on Charter, Charter's argument focuses primarily on the alleged impact of the Debtor's bankruptcy filing and winding down on Charter's expectation that the Debtor would continue to serve as the entity that billed the Homeowners. *Id.* at 18-19. Specifically, Charter determined that—when it began receiving requests from Homeowners for individual service contracts following the Debtor's bankruptcy filing—it "had lost its basis for entering into the [Bulk Services Agreement]" with RIM and entered into individual service contracts with some Homeowners. *Id.* at 18. Charter's understanding largely derived from communications with Homeowners and a copy of a letter from counsel for the Debtor to the Homeowners, dated June 2, 2014, which advised the Homeowners of the Debtor's bankruptcy filing, to cease paying any monies to the Debtor, and to contact the service provider directly to avoid a service interruption. *See* Tr. 69-71; *see also* Charter's Ex. 3, Letter from Robert V. Roussos dated June 2, 2014. More relevant to the matter before the Court is Charter's contention that a relationship between the multiple contracts caused the subsequent entry of the Assignment Order to affect Charter because the Chapter 7 Trustee assumed and assigned the Communications Agreement to IVMA without also assuming and assigning the Homeowners Agreements to any entity, leaving IVMA with no mechanism to collect and remit to RIM the Service Fee for Basic Services and resulting in an impact on Charter's interests under the Bulk Services Agreement. *See* Charter's Opening Brief at 20-21. Thus, the essence of Charter's argument is best likened to an argument for the application of the

---

an attempt to convey a relationship between the Communications Agreement, Homeowners Agreements, and Bulk Services Agreement, which Charter alleges led to the Assignment Order's impact on Charter's underlying expectations with respect to the Bulk Services Agreement. *See* Charter's Opening Brief at 20-21 (explaining Charter's expectation that the Debtor would collect the Service Fee for Basic Services from the Homeowners). Accordingly, Charter's reliance on the language from *Kem* and *In re La Sierra Financial Services* in its argument for this purpose is misplaced.

exception to the plain language of Federal Rule of Civil Procedure 60(b) recognized by the Second Circuit for nonparties whose independent rights or legal interests were "strongly affected" by a judgment or "sufficiently connected and identified" with the underlying proceeding.  *See Grace v. Bank Leumi Trust Co. of N.Y.*, 443 F.3d 180, 188 (2d Cir. 2006); *Dunlop v. Pan Am. World Airways, Inc.*, 672 F.2d 1044, 1052 (2d Cir. 1982).

The Second Circuit cautioned in *Grace* that the exception available to nonparties who are "strongly affected" by a judgment or "sufficiently connected and identified" with the underlying suit is "exceedingly narrow."  *Grace*, 443 F.3d at 189.  Such a determination is highly fact-specific, and courts are careful to limit their holdings to the facts.  *See e.g.*, *id.* at 188 ("Today, as in *Dunlop*, we limit our decision to the facts of this case . . . .").  In *Grace*, the court held that nonparty movants were "strongly affected" by an order approving a stipulation of settlement between plaintiffs and a judgment-proof defendant and determined the movants had nonparty standing under Federal Rule of Civil Procedure 60(b) to seek relief from the order because the plaintiffs entered into the settlement with the intent to pursue the nonparties for the judgment amount and attempted to use the judgment as the basis for a fraudulent conveyance action.  *Id.* In *Dunlop*, former airline employees invoked Federal Rule of Civil Procedure 60(b) to amend a stipulation of dismissal in a federal age-discrimination suit filed by the Secretary of Labor against the airline to clarify that the order would not bar the former employees' individual state law age-discrimination claims, which had been held in abeyance during the federal litigation. *Dunlop*, 672 F.2d at 1050.  The former employees were not among those entitled to share in the proceeds of the settlement, which had been distributed only to a subclass of individuals, nor did they receive prior notice of the settlement and proposed distribution.  *Id.* at 1048.  Nevertheless, the terms of the stipulation of dismissal appeared to preclude any future litigation by the former

29

employees against the airline.  *Id.*  Emphasizing that nonparty standing is not ordinarily available pursuant to Federal Rule of Civil Procedure 60(b) and explicitly limiting its holding to the facts of the case, the Second Circuit held the former employees "were sufficiently connected and identified with the Secretary [of Labor's] suit to entitle them to standing to invoke Rule 60(b)(6)."  *Id.* at 1052.

In the context of a bankruptcy proceeding and, specifically, a motion to assume and assign pursuant to 11 U.S.C. § 365, the bankruptcy court's decision in *In re Martin Paint Stores, Inc.*, 199 B.R. 258 (Bankr. S.D.N.Y. 1996) provides an illustrative analysis of whether a nonparty is sufficiently interested in the proceeding to be conferred standing as a "party in interest."   As the "party in interest" analysis evaluates a nonparty's relationship to the proceeding, this will inform the Court's inquiry with regard to whether the nexus Charter asserts between the Assignment Order and Charter's interests under the Bulk Services Agreement causes Charter to be "strongly affected" by the Assignment Order or establishes that Charter is "sufficiently connected and identified with" the underlying proceeding.

In *In re Martin Paint Stores*, a chapter 11 debtor sought to assign a lease of retail space where the debtor had operated a store, which sold paint and related goods, to a women's clothing retailer.  199 B.R. at 260.  Another of the lessor's tenants who presently sold women's clothing objected to the assumption and assignment on the basis of a use clause in the debtor's lease and an exclusivity provision in its own lease that prevented the lessor from renting space to any other tenant that sold women's clothes exclusively.  *Id.* at 261.  The existing tenant was concerned that the assignment of the debtor's lease to another women's clothing retailer would result in "'irreparable and incalculable injury.'"   *Id.*   The court considered whether the tenant had standing to object to the assignment motion under 11 U.S.C. § 1109(b), which allows a "party in

interest" to be heard on any issue in a chapter 11 case.[17]   *Id.* at 263-64.  To determine the

meaning of "party in interest" in bankruptcy, a court must look to the purpose of the Bankruptcy

Code.  *Id.* at 264 (citing *Roslyn Sav. Bank v. Comcoach Corp.* (*In re Comcoach Corp.*), 698 F.2d

571, 573 (2d Cir. 1983)).  With this in mind, the court described the scope of a "party in interest"

as follows:

> One purpose of bankruptcy is to convert the debtor's assets to cash and distribute
> that cash to the creditors, [*In re Comcoach Corp.*, 698 F.2d at 573]; *In re
> Ionosphere Clubs, Inc.*, 101 B.R. 844, 849 (Bankr. S.D.N.Y. 1989), and hence, a
> "party in interest" is reserved to the debtor or one who is a creditor of the estate,
> *In re Comcoach Corp.*, 698 F.2d at 573, or is able to assert an equitable claim
> against the estate.  *In re Ionosphere Clubs, Inc.*, 101 B.R. at 849.  Conversely, a
> creditor of the debtor's creditor is not a "party in interest", *In re Comcoach Corp.*,
> 698 F.2d at 574; *In re Lifeco Inv. Group, Inc.*, 173 B.R. 478, 487 (Bankr. D. Del.
> 1994); *In re Riverside Nursing Home*, 43 B.R. 682, 684 (Bankr. S.D.N.Y. 1984);
> *see In re Goldman*, 82 B.R. 894, 896 (Bankr. S.D. Ohio 1988), and the term does
> not encompass a person who is merely "concerned" with the results of the
> proceeding.  *In re Goldman*, 82 B.R. at 896.

*Id.*; *see also In re Goldman*, 82 B.R. at 896 ("[B]ankruptcy courts are designed to resolve

disputes between creditors and debtors and, in chapter 7 cases, to facilitate the orderly and

efficient liquidation of a debtor's assets. . . .  [T]he performance of these basic functions of a

bankruptcy court would not be possible if creditors of a debtor's creditors were routinely

considered 'parties in interest.'").

With respect to the debtor's assumption and assignment of the executory contract, the

court observed that its role was to ensure the counterparty—the landlord—was not prejudiced

and received the benefit of its bargain.  *In re Martin Paint Stores*, 199 B.R. at 264.  The court

---

[17] Section 1109(b) and the related analysis have been utilized to illustrate the meaning of
"party in interest" with respect to motions under 11 U.S.C. § 365 in chapter 7 cases because
Federal Rule of Bankruptcy Procedure 6006(c) provides that the court may direct that notice be
given to "other parties in interest."  *See, e.g.*, *In re Goldman*, 82 B.R. 894, 896 (Bankr. S.D. Ohio
1988).

further acknowledged that to the extent it must consider "other tenant" issues, such considerations are intended only to protect the landlord's economic expectations. *Id.* Thus, because "[11 U.S.C. § 365] does not deal with a third party's benefit of its own bargain with the landlord, and [the existing tenant's] position is analogous to the creditor of a creditor," the court held that the existing tenant lacked standing to object to the assumption and assignment of the lease. *Id.* In arriving at its holding, the court contrasted the existing tenant's position with that of a nonparty with an interest or right arising under the debtor's lease, such as an intended beneficiary or a creditor with a security interest in the lease. *Id.* at 264-65.

Here, the Court has already determined that Charter lacks any enforceable legal rights in the Communications Agreement as an intended third-party beneficiary or as a party to an integrated transaction that encompasses the Communications Agreement. Although the evidence before the Court suggests that RIM was current in its payments under the Bulk Services Agreement through Charter's debulking of services, the Court accepts that Charter may have been concerned as to IVMA's ability, as the assignee of the Debtor's rights in the Communications Agreement, to collect and remit to RIM the Service Fee for Basic Services and the indirect impact this may have on Charter under its separate agreement with RIM. Regardless of whether the Assumption Order may have indirectly impacted Charter's pecuniary interests under the Bulk Services Agreement, the Court is not required to protect for Charter the benefit of its bargain under its agreement with RIM or resolve issues resulting from Charter's decision to debulk and enter into individual service contracts with some Homeowners despite the uncontroverted evidence that RIM was current in its payments to Charter, just as the court in *In re Martin Paint Stores* was not obliged to ensure the existing tenant received the benefits of the exclusivity provision in its lease. Charter would naturally be concerned about any factor that

32

may impact upon RIM's ability to make payment under the Bulk Services Agreement, but mere concern with the results of a proceeding does not confer "party in interest" status.  *See In re Goldman*, 82 B.R at 896 (holding that a nonparty, which possessed an expectation that it might prevail in a state court suit to attach an option contract, was not a "party in interest" under Federal Rule of Civil Procedure 6006(c) and lacked standing to object to the chapter 7 trustee's motion to reject the contract).  By contrast, RIM—the counterparty to the Communications Agreement—could have raised the concerns cited by Charter with respect to IVMA's ability to collect and remit to RIM the fees for Basic Services under the Communications Agreement; however, RIM, in the apparent exercise of its business judgment, has never raised any challenge to the Assignment Motion or Assignment Order.  Charter would not have been without recourse if RIM failed to pay as the Bulk Services Agreement provides clear remedies to protect Charter should RIM fail to pay as expected.  Bulk Services Agreement at 10.

Thus, similar to the existing tenant in *In re Martin Paint Stores* whose connection and concern with respect to the proceeding related to the tenant's own retail lease with the lessor, Charter's connection to the instant matter is derivative of its contractual relationship with RIM under the Bulk Services Agreement.  Indeed, the Court can envision any number of scenarios where nonparties who are in contractual relationships with a debtor's creditor, but have no direct connection to the debtor or estate, might be indirectly impacted by bankruptcy court action that affects the debtor-creditor relationship.  However, as observed by the court in *In re Martin Paint Stores*, to expand the meaning of "party in interest" to these derivative interests would be inappropriate in light of the purposes of bankruptcy and 11 U.S.C. § 365.  *See In re Martin Paint Stores*, 199 B.R. at 264 (citations omitted) (explaining that the meaning of the term "party in interest" in a bankruptcy proceeding must be construed in accordance with the purposes of Title

33

11 and does not include a person, such as a creditor of the debtor's creditor, who is merely
"concerned" with the results of a proceeding.)

Accordingly, Charter would not have been entitled to standing as "party in interest" to
challenge the Assignment Motion.  The Court finds that the foregoing analysis must also lead to
the conclusion that Charter is not now entitled to nonparty standing to seek reconsideration of the
Assignment Order pursuant to Federal Rule of Civil Procedure 60(b) on the basis that the
contracts are interconnected such that its interests under the Bulk Services Agreement were
"strongly affected" by the Assignment Order or "sufficiently connected and identified" with the
underlying suit.  The Court finds that this result is consistent with the reasoning of the Second
Circuit in *Grace* and *Dunlop*, where the facts established that the judgment directly affected the
nonparties' rights, either because the nonparty was the intended target for collection of a
judgment, *see Grace*, 443 F.2d at 188, or because the judgment appeared specifically to preclude
the nonparties' ability to litigate in another forum, *see Dunlop*, 672 F.2d at 1050-52.  The instant
matter is clearly distinguishable from these scenarios as Charter is only indirectly connected with
the Assignment Order and underlying proceeding through its contractual relationship with RIM.
Thus, because Charter has failed to establish a nexus between the Communications Agreement,
Homeowners Agreement, and Bulk Services Agreement that causes its interests under the Bulk
Services Agreement to be "strongly affected" by the Assignment Order or "sufficiently
connected and identified" with the underlying proceeding, Charter cannot obtain standing to
invoke Federal Rule of Civil Procedure 60(b) on this basis.

  **d.**  **Whether Charter Has Standing to Seek Relief Pursuant to Federal Rule of Civil
Procedure 60(b) Because Charter was Denied Due Process of Law**

Charter asserts that it is entitled to request reconsideration of the Assignment Order under
Federal Rule of Procedure 60(b)(4) and 60(b)(6) because it was denied due process of law when

it did not receive notice of the underlying Assignment Motion.  *See* Charter's Opening Brief at 7-8.  While Charter specifically concedes "[t]here is no dispute that the [Chapter 7] Trustee in the present case gave adequate notice to counsel for the Debtor and RIM, and to the United States trustee," it contends that Charter was also entitled to notice of the Assignment Motion pursuant to Federal Rule of Bankruptcy Procedure 6006(c) and the Fifth Amendment's Due Process Clause.[18]  *Id.* at 8; *see also* Tr. 36-37.

> Federal Rule of Bankruptcy Procedure 6006(c) provides as follows:
>
> Notice.  Notice of a motion made pursuant to subdivision (a) or (b) of this rule shall be given to the other party to the contract or lease, to other parties in interest as the court may direct, and, except in a chapter 9 municipality case, to the United States trustee.

Fed. R. Bankr. P. 6006(c).  It is clear that the Chapter 7 Trustee did not provide Charter with notice of the Assignment Motion.  Further, the Court did not direct that Charter or any party in interest receive notice pursuant to Federal Rule of Bankruptcy Procedure 6006(c).

In support of its contention that it was entitled to notice of the Assignment Motion, Charter looks to the United States Supreme Court's decision in *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950), which states that due process requires that interested parties receive adequate notice and opportunity for hearing.  *See* Charter's Opening Brief at 9.  However, it is axiomatic that the *Mullane* standard and the protections of procedural due process are implicated only if there is a protected property interest at issue.  *See In re Ctr. Wholesale*, *Inc.*, 759 F.2d at 1445 ("To have standing to bring a Rule 60(b) motion challenging

---

[18]  Charter also attempts to raise the issue of notice to the Homeowners.  *See* Charter's Opening Brief at 8.  Charter itself admits it lacks standing to raise the rights of the Homeowners. *See id.* at 8 n.2.  The Court stated at the hearing held on the Motion to Reconsider on April 14, 2015, that Charter was not permitted to advance any argument on the Homeowners' behalf.  Tr. at 112.  No Homeowner has filed any pleading with this Court asserting his or her own rights in this matter.  Accordingly, the Court will not consider the rights of the Homeowners in this proceeding.

[an order] on due process grounds, [the movant] must show that it had property rights affected by the [order].").  Thus, Charter cannot raise a procedural due process challenge to the Assignment Order unless it can establish that it had a property interest that was affected by the Assignment Order.  The Court will briefly revisit its determinations with respect to the theories Charter has advanced in support of its claim that it possesses a property interest affected by the Assignment Order.

The Court has already determined that Charter lacks any legally protected property interest in the Communications Agreement as an intended third-party beneficiary.  Accordingly, Charter was not entitled to notice of the Assignment Motion pursuant to Federal Rule of Bankruptcy Procedure 6006(c) as an intended third-party beneficiary and lacks standing to seek reconsideration of the Assignment Order on due process grounds on this basis.

Further, the Court determined that Charter failed to demonstrate that the Bulk Services Agreement and Communications Agreement should be construed as one integrated transaction to which Charter is a party.  Accordingly, Charter can neither derive a due process protected property interest nor establish entitlement to notice under Federal Rule of Bankruptcy Procedure 6006(c) on the theory that it is a party to single contract that encompasses both the Communications Agreement and the Bulk Services Agreement.

Finally, the Court has also determined that Charter's indirect connection to the Communications Agreement through its contractual relationship with RIM under the Bulk Services Agreement is insufficient to confer "party in interest" status.  Since Charter does not fall within the scope of "party in interest," it was not entitled to notice of the Assignment Motion under Federal Rule of Bankruptcy Procedure 6006(c).  Accordingly, it cannot assert "party in interest" status as the basis for a due process challenge to the Assignment Order.

Therefore, the Court concludes that Charter lacks standing to challenge the Assignment Order on due process grounds.

### III.    Conclusion

Having considered the arguments and evidence in this matter, the Court concludes that Charter lacks standing to seek reconsideration of the Assignment Order pursuant to Federal Rule of Civil Procedure 60(b). To be sure, the Assignment Order may not be immune from challenge under Federal Rule of Civil Procedure 60(b), but the Court may only consider such a challenge once it is satisfied the challenging party has standing to raise it. Having determined that Charter lacks the requisite standing under Federal Rule of Civil Procedure 60(b), the Court further concludes that it cannot reach the merits of Charter's arguments in support of reconsideration.

For these reasons, the Court finds that the Motion to Reconsider must be denied. The Court will enter a separate Order consistent with the findings and conclusions contained in this Memorandum Opinion.

The Clerk shall deliver copies of this Memorandum Opinion to Lisa P. Sumner, counsel for Charter Communications VI, LLC; James R. Sheeran, counsel for Remington Infrastructure Management, L.L.C. and Infrastructure Management VA, LLC; Robert V. Roussos, counsel for the Debtor; and Clara P. Swanson, Chapter 7 Trustee.

Entered this 24th day of March, 2016, at Norfolk in the Eastern District of Virginia.

FRANK J. SANTORO
United States Bankruptcy Judge

Entered on Docket: 03/24/2016